## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

TRIPLE A INTERNATIONAL, INC.,

      Plaintiff,                               Case No. 10-15137

vs.                                          Hon. Gerald E. Rosen

THE DEMOCRATIC REPUBLIC OF
THE CONGO,

      Defendant.

_____/

## OPINION AND ORDER REGARDING
## DEFENDANT'S MOTION TO DISMISS

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on _____February 10, 2012_____

PRESENT:  Honorable Gerald E. Rosen
                     Chief Judge, United States District Court

## I.  INTRODUCTION

In this case, Plaintiff Triple A International, Inc., a Michigan corporation, seeks to collect on a debt allegedly owed to it by the Defendant Democratic Republic of the Congo ("DRC"), a nation located in central Africa.  This debt arises from a contract entered into by Plaintiff and the DRC's predecessor, Zaire, in late 1993, under which Plaintiff procured light equipment for Zaire's military.  According to Plaintiff's complaint, the DRC has repeatedly acknowledged its indebtedness to Plaintiff over the years, but has nonetheless failed to pay this debt, which allegedly amounts to over $14 million.

Through the present motion, the DRC seeks the dismissal of Plaintiff's complaint on four separate grounds.  First, the DRC asserts that it is protected by sovereign immunity, and that the "commercial activity" exception to this immunity set forth in the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq.,* is not triggered by the allegations of Plaintiff's complaint.  Next, even if the FSIA confers jurisdiction over this suit, the DRC contends that the Court should refrain from exercising this jurisdiction under the doctrine of *forum non conveniens.*  Third, the DRC argues that Plaintiff has forfeited its right to seek judicial redress arising from the parties' dispute, by virtue of a provision in a 2009 memorandum of understanding that the DRC construes as a covenant not to sue.  Finally, the DRC contends that Plaintiff's claims are barred by Michigan's six-year statute of limitations for breach-of-contract suits.

The DRC's motion has been fully briefed by the parties.  Having reviewed the parties' written submissions in support of and opposition to this motion, as well as the accompanying exhibits and the remainder of the record, the Court finds that the pertinent facts, allegations, and legal issues are sufficiently presented in these materials, and that oral argument would not assist in the resolution of the DRC's motion.  Accordingly, the Court will decide this motion "on the briefs."  *See* Local Rule 7.1(f)(2), U.S. District Court, Eastern District of Michigan.  This opinion and order sets forth the Court's rulings on the DRC's motion.

## II.  <u>FACTUAL BACKGROUND</u>

2

Plaintiff Triple A International, Inc. is "in the business of conducting and facilitating international business transactions throughout the world."  (Complaint at ¶ 6.) The company was formed in 1991, is incorporated under Michigan law, and maintains its principal place of business in Dearborn, Michigan.  At various times, Plaintiff has maintained satellite offices in Sierra Leone and the DRC.[1]

In late 1993, the government of the African country then known as Zaire[2] solicited Plaintiff to procure supplies for its military, including such items as uniforms, boots, and sleeping bags.  According to Plaintiff's complaint, the company worked from its office in Michigan to identify a supplier for the goods sought by the DRC.  Plaintiff's president, Ali Sulaiman, asserts in his affidavit that the DRC was aware that Plaintiff would carry out its obligations in the United States, and that the DRC "purposefully retained Triple A because it was a United States company with the appropriate expertise to broker an international

_____

[1]In 1992, the president of the Plaintiff corporation, Ali Sulaiman, formed a limited liability company in the DRC called "Triple A International, LLC."  According to Mr. Sulaiman, this DRC-based limited liability company played no role in the underlying transaction with the DRC that gives rise to this suit, and the DRC instead dealt solely with the Michigan-based Plaintiff corporation.  (*See* Plaintiff's Response, Ex. O, Sulaiman Decl. at ¶ 4.)  Although the DRC disputes this, stating that its government "all along believed that it was dealing with a DRC entity," (Defendant's Motion, Br. in Support at 6), the documents exchanged between the parties in the course of their dealings consistently identified the contracting party as "Triple A International, Inc.," the Michigan-based Plaintiff corporation.  (*See* Complaint, Exs. A-G.)  To be sure, certain of these documents refer to a corporate office located in the DRC's capital city, Kinshasa.  (*See, e.g.,* Complaint, Exs. A, B.)  Yet, this evidently was the address of Plaintiff's satellite office in the DRC; Plaintiff's initial proposal, for example, was sent on corporate letterhead that lists offices located in both Michigan and the DRC.  (*See* Complaint, Ex. A.)

[2]In 1997, Zaire was renamed the DRC following the collapse of a dictatorship and a lengthy period of war.  Throughout the balance of this opinion, the Defendant nation will be referred to as the DRC.

3

transaction legitimately and expeditiously."  (Plaintiff's Response, Ex. O, Sulaiman Decl. at ¶ 6.)

After consulting catalogs and communicating with potential suppliers from its office in Dearborn, Michigan, Plaintiff ultimately selected a South Korean manufacturer to provide the goods sought by the DRC.  A representative of the Plaintiff corporation then traveled to the DRC and to South Korea to make the necessary arrangements, culminating in Plaintiff's submission of a January 5, 1994 proposal to the DRC.  (*See* Complaint, Ex. A.)[3]  Following an inspection of a sample of the goods to be produced by the South Korean supplier, a senior DRC government official accepted Plaintiff's proposal and approved the purchase of military supplies at a cost of just over $14 million.  (*See* Complaint, Ex. B.)  Plaintiff's proposal called for payment to be made into an account at the Bank of Zaire, (*see* Complaint, Ex. A), and the DRC's acceptance, in turn, called for this payment to be made in the currency of Zaire, with delivery of the goods to be made at a location in the DRC's capital city of Kinshasa, (*see* Complaint, Ex. B).

According to the complaint, Plaintiff fulfilled all of its obligations under the parties' contract, and a DRC government official issued instructions in October of 1994 to pay Plaintiff for the goods it had procured on the DRC's behalf.  (*See* Complaint, Ex. C.)  No payment was forthcoming, however.  In early 1997, Plaintiff again secured a

---

[3]The documents exchanged between the parties were written in French, but Plaintiff has provided English translations of these documents, and the parties apparently agree upon the accuracy of these translations.

4

commitment from a DRC government official to pay the debt owed to the company, (*see* Complaint, Ex. D), but the DRC once again failed to make this payment.

From 1997 until 2003, the DRC was beset by war and its government was overthrown.  After hostilities ceased in 2003, Plaintiff renewed its efforts to secure payment of the debt owed by the DRC, and in January of 2004, a DRC government official issued a certificate acknowledging the country's indebtedness to Plaintiff.  (*See* Complaint, Ex. E.)  Similarly, a government official requested in September of 2007 that the DRC pay the debt owed to Plaintiff.  (*See* Complaint, Ex. F.)  Most recently, the parties entered into negotiations in the spring of 2009, resulting in the execution of a memorandum of understanding in which the DRC acknowledged its debt to Plaintiff and agreed to repay this debt through fourteen monthly payments of just over $1 million each. (*See* Complaint, Ex. J.)[4]  To date, however, no such payments have been made.  This lawsuit followed, with Plaintiff seeking to recover the debt of over $14 million allegedly owed to it by the DRC.

---

[4]One provision of this memorandum of understanding states that "[a]ny dispute related to this contract will be settled by friendly arrangement, while excluding all other legal proceedings."  (Complaint, Ex. J, Memorandum of Understanding at 2.)  The DRC reads this provision as a covenant not to sue, and it relies on this provision as one of the grounds for seeking the dismissal of this action.

# III.  ANALYSIS

## A.     The Standards Governing Defendant's Motion

Through the present motion, the Defendant DRC seeks the dismissal of Plaintiff's complaint on a number of grounds.  First and foremost, the DRC contends that this Court lacks subject matter jurisdiction in light of the sovereign immunity conferred upon foreign states under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq.*  In addressing this jurisdictional challenge brought under Fed. R. Civ. P. 12(b)(1), the Court "takes the allegations in the complaint as true," inquiring whether these allegations establish a basis for the exercise of subject matter jurisdiction.  *Gentek Building Products, Inc. v. Steel Peel Litigation Trust,* 491 F.3d 320, 330 (6th Cir. 2007).[5]  Yet, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice" to withstand a properly supported Rule 12(b)(1) motion to dismiss.  *O'Bryan v. Holy See,* 556 F.3d 361, 376 (6th Cir. 2009) (internal quotation marks and citation omitted).

_____

[5]The Court views the DRC's motion as mounting a facial rather than a factual challenge to the existence of subject matter jurisdiction.  *See Gentek Building Products,* 491 F.3d at 330 (distinguishing between these two types of jurisdictional challenges).  In particular, the DRC's jurisdictional arguments rest almost exclusively on the allegations of Plaintiff's complaint, and generally accept these allegations as true.  The sole exception is the DRC's suggestion in its motion that it did business with — or at least "believed it was doing business with," (Defendant's Motion, Br. in Support at 5 n.1) — an entity formed in the DRC, "Triple A International, LLC," rather than the Michigan-based Plaintiff corporation, "Triple A International, Inc."  As noted earlier, however, the documents accompanying Plaintiff's complaint uniformly support the complaint's allegations that the DRC dealt with the Michigan-based Plaintiff corporation, rather than a DRC-based entity, and the DRC has not cited any evidence to support the contrary assertion advanced in its motion.  Accordingly, the Court may accept as true the complaint's allegations as to the identity of the contracting party, and there is no need for the Court to address any factual disputes in order to resolve the DRC's jurisdictional challenge.

As the Sixth Circuit has observed, "[a]pplying the standards under [Rule] 12(b)(1) to the FSIA context is complicated by FSIA's burden-shifting process." *O'Bryan,* 556 F.3d at 376. "The party claiming FSIA immunity bears the initial burden . . . of establishing a prima facie case that it satisfies the FSIA's definition of a foreign state; once this prima facie case is established, the burden of production shifts to the non-movant to show that an exception [to FSIA immunity] applies." *O'Bryan,* 556 F.3d at 376 (internal quotation marks and citation omitted). Yet, "[t]he party claiming immunity under FSIA retains the burden of persuasion throughout this process." 556 F.3d at 376. When addressing a facial jurisdictional challenge, such as the DRC is pursuing here, the Court must accept the complaint's allegations as true, and then — assuming the moving party has met its threshold burden of establishing its entitlement to immunity under the FSIA as a foreign state — inquire whether these allegations "bring the case within any of the FSIA exceptions to immunity invoked by the plaintiff." 556 F.3d at 376 (internal quotation marks, alteration, and citations omitted). With these standards in mind, the Court turns to the DRC's claim of sovereign immunity.[6]

## B.    The DRC's Sovereign Immunity Is Not Overcome by the "Commercial Activity" Exception Set Forth in the FSIA.

Under the FSIA, "a foreign state is presumptively immune from the jurisdiction of United States courts," and "unless a specified exception applies, a federal court lacks

---

[6]In light of the Court's resolution of this jurisdictional challenge, there is no need to address the standards that govern the remaining arguments advanced in the DRC's motion as grounds for the dismissal of this suit.

7

subject-matter jurisdiction over a claim against a foreign state." *Saudi Arabia v. Nelson*, 507 U.S. 349, 355, 113 S. Ct. 1471, 1476 (1993); *see also* 28 U.S.C. § 1604 (providing that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter").  In this case, the parties agree that the Defendant DRC qualifies as a "foreign state" as this term is defined in the FSIA.  It follows that subject matter jurisdiction is lacking here unless the allegations of Plaintiff's complaint trigger one of the exceptions set forth in the FSIA.

In this case, Plaintiff appeals to the FSIA's "commercial activity" exception.  In particular, the pertinent FSIA provision withholds a foreign state's usual immunity from suit where

> . . . [an] action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2).  The jurisdictional allegations of Plaintiff's complaint invoke the first and third clauses of this provision.  (*See* Complaint at ¶ 3.)  In its response to the DRC's motion, however, Plaintiff expressly disavows any reliance on the third clause of § 1605(a)(2), and instead rests its claim of subject matter jurisdiction solely upon the first clause.  (*See* Plaintiff's Response Br. at 9-11.)

Accordingly, the existence of subject matter jurisdiction here turns on the question

8

whether Plaintiff's claims are "based upon a commercial activity carried on in the United States by" the DRC.[7]  If this statutory language were applied in strict accordance with its literal terms, jurisdiction would surely be lacking.  Plaintiff does not allege that the DRC engaged in any activity, commercial or otherwise, in the United States.  Rather, the only activities identified in the complaint, or elsewhere in the record, as conducted in the United States were carried out by Plaintiff from its Michigan offices.  As evidenced by the language of the statute itself, and as the courts have recognized, § 1605(a)(2) mandates an inquiry into the commercial activity conducted "by the foreign state," and not by the person or entity with which the foreign state enters into a commercial relationship.  *See, e.g., Riedel v. Bancam, S.A.,* 792 F.2d 587, 591 (6th Cir. 1986) (observing that "§ 1605(a)(2) applies only when a foreign state's 'commercial activity' has the requisite jurisdictional nexus with the United States"); *Santos v. Compagnie Nationale Air France,* 934 F.2d 890, 893 n.3 (7th Cir. 1991) ("The commercial activity to which the statute refers is the activity of the defendant foreign government."); *de Sanchez v. Banco Central de Nicaragua,* 770 F.2d 1385, 1391 (5th Cir. 1985) (explaining that the inquiry under § 1605(a)(2) "focus[es] on the acts of the named defendant, not on other acts that may have had a causal connection with the suit").

_____

[7]The parties are in agreement that the DRC qualifies as a "foreign state" under the FSIA. They further agree that the DRC's entry into a contractual relationship with Plaintiff for the acquisition of military supplies constitutes "commercial activity" under the statute. *See, e.g., McDonnell Douglas Corp. v. Islamic Republic of Iran,* 758 F.2d 341, 348-49 (8th Cir. 1985) (holding that a foreign state's purchase of equipment for use by its military qualified as "commercial activity" under the FSIA).  The sole point of contention, then, is whether this commercial activity was "carried on in the United States by" the DRC.

Yet, this seemingly straightforward inquiry into the locus of the DRC's activities is complicated by another FSIA provision, which broadens the definition of "commercial activity carried on in the United States by a foreign state" to encompass "commercial activity carried on by such state and having substantial contact with the United States."  28 U.S.C. § 1603(e).  Under this definition, then, a foreign state evidently need not conduct any commercial activity in the United States, so long as its commercial activity carried on elsewhere has "substantial contact" with the United States.  As stated in the FSIA's legislative history:

> As paragraph (d) of section 1603 indicates,[8] a commercial activity carried on in the United States by a foreign state would include not only a commercial transaction performed and executed in its entirety in the United States, but also a commercial transaction or act having a 'substantial contact' with the United States.  This definition includes cases based on commercial transactions performed in whole or in part in the United States, import-export transactions involving sales to, or purchases from, concerns in the United States, . . . and an indebtedness incurred by a foreign state which negotiates or executes a loan agreement in the United States, or which receives financing from a private or public lending institution located in the United States — for example, loans, guarantees or insurance provided by the Export-Import Bank of the United States.  It will be for the courts to determine whether a particular commercial activity has been performed in whole or in part in the United States.  This definition, however, is intended to reflect a degree of contact beyond that occasioned simply by U.S. citizenship or U.S. residence of the plaintiff.

H.R. Rep. No. 94-1487, at 17 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6615-16.

In Plaintiff's view, the activity in which the DRC engaged is comparable to at least

---

[8]At the time this congressional report was issued, the FSIA's definition of "commercial activity carried on in the United States by a foreign state" appeared at § 1603(d).  Following more recent amendments to the statute, this definition is now set forth at § 1603(e).

two of the examples cited in this passage of the FSIA's legislative history as illustrative of commercial activity having a "substantial contact" with the United States. First, Plaintiff contends that the parties engaged in an "import-export transaction[]" within the meaning of this passage. While the goods purchased by the DRC in the parties' transaction were manufactured in South Korea and shipped directly from this South Korean supplier to the DRC, (*see* Plaintiff's Response, Ex. Q), Plaintiff notes that it made the arrangements for this purchase and shipment from its offices in the United States. These U.S.-based activities, according to Plaintiff, serve as the "substantial contact" required under the statute to trigger the "commercial activity" exception to sovereign immunity.

The case law cited by Plaintiff in support of this "import-export" theory of jurisdiction, however, is readily distinguishable and not especially helpful. First, Plaintiff points to the court's observation in *Zedan v. Kingdom of Saudi Arabia,* 849 F.2d 1511, 1513 (D.C. Cir. 1988), that "a contractual arrangement, one part of which is to be performed in the United States, constitutes a substantial contact with the United States." Yet, this statement in *Zedan* is pure dicta, reflecting the court's broad characterization and general understanding of the above-quoted passage from the FSIA's legislative history. In fact, the court in *Zedan* determined that the first clause of § 1605(a)(2) did ***not*** apply in that case, where the sole contact with the United States by the foreign state, Saudi Arabia, was a telephone call recruiting the American plaintiff to travel to Saudi Arabia and work on a road construction project. *See Zedan,* 849 F.2d at 1513-14. Because this phone call did not itself result in a contract, but was simply a "preliminary step in a chain of events"

11

culminating in a contractual relationship, the court held that this "mere[] precursor[]" to a commercial transaction did not rise to the level of commercial activity having "substantial contact" with the United States. *Zedan,* 849 F.2d at 1513. More generally, despite its suggestion that partial performance of a contract in the United States would qualify as "substantial contact," the court recognized that "isolated or transitory contacts with the United States do not suffice." 849 F.2d at 1513.

The second case cited by Plaintiff, while more on point, is nonetheless factually distinguishable. In *Gibbons v. Udaras na Gaeltachta,* 549 F. Supp. 1094, 1115 (S.D.N.Y. 1982), the court found that a transaction between the plaintiffs, two American citizens, and the defendant instrumentality of the Republic of Ireland (Gaeltarra Eireann, or "GE") had the requisite "substantial contact" with the United States, where the parties' agreement encompassed "an export transaction whereby GE agreed to purchase goods (to be acquired by plaintiffs) and services (to be provided by plaintiffs) for delivery in Ireland." In so ruling, the court observed that the parties' agreement "resulted from substantial contractual negotiations conducted by GE in the United States," and it reasoned that this alone would "permit a conclusion that GE carried on a commercial activity in the United States." *Gibbons,* 549 F. Supp. at 1113-14. In addition, the court cited the plaintiffs' allegations that GE's participation in the contractual relationship "was conditioned on plaintiffs' promise to perform a substantial part of the contract in the United States," including the "purchase [of] hundreds of thousands of dollars['] worth of machinery in the United States for delivery to" an Irish company. 549 F. Supp. at 1114-15.

12

The facts here are different in two respects.  First, the parties' contract negotiations evidently were held exclusively in the DRC, with no portion of these negotiations conducted in the United States.  Indeed, as noted earlier, the DRC engaged in no activities whatsoever in the United States in connection with its contractual relationship with Plaintiff.  Next, there is nothing in the parties' contract that reflects any promise or shared understanding that a substantial portion of Plaintiff's obligations would be performed in the United States.  So far as the record reveals, the DRC was indifferent as to the location from which Plaintiff would obtain and ship the requested military supplies — and, of course, these goods ultimately were manufactured in and shipped from South Korea, not the United States.  In addition, Plaintiff's proposal called for payment to be made into an account at the Bank of Zaire, (*see* Complaint, Ex. A), and the DRC's acceptance stipulated that this payment would be made in the currency of Zaire, (*see* Complaint, Ex. B).  In short, then — and in contrast to the facts presented in *Gibbons* — the bulk of the parties' contractual obligations were to be performed in the DRC (or at other, unspecified locations), rather than in the United States.

To be sure, Plaintiff carried out some of its contractual obligations — including identifying possible sources for the military supplies sought by the DRC, and arranging for the manufacture and shipment of these goods from a South Korean supplier to the DRC — from its office in Michigan, and the above-quoted passage from the FSIA's legislative history references commercial transactions performed "in whole or in part" in the United States.  Yet, in the various documents exchanged between the parties leading up to their

13

contractual relationship, there is no indication that the DRC sought this U.S.-based performance, or placed any importance on the likelihood that Plaintiff might undertake some of its contractual duties from its Michigan office. Indeed, this documentary record leaves open the possibility that the DRC was not even aware of the place of Plaintiff's performance. Most notably, Plaintiff presented its proposal on company letterhead that listed its offices in Michigan and the DRC, (*see* Complaint, Ex. A), and nothing in the record evidences the DRC's understanding or belief that Plaintiff would operate exclusively (or even primarily) out of its Michigan office as it procured the military supplies referenced in its proposal. From this record, then, it appears that Plaintiff's performance of some of its contractual duties in Michigan was largely a product of happenstance or Plaintiff's own choice or convenience, rather than a result of the DRC's deliberate engagement in commercial activity having "substantial contact" with the United States. As noted in the above-quoted congressional report, and as is clear from the statutory requirement of "substantial" contact arising from the commercial activity of the foreign state, to satisfy the first clause of the FSIA's "commercial activity" exception, there must be a "degree of contact beyond that occasioned simply by U.S. citizenship or U.S. residence of the plaintiff." H.R. Rep. No. 94-1487, at 17, *reprinted in* 1976 U.S.C.C.A.N. at 6616.[9]

_____

[9]In an affidavit accompanying Plaintiff's response to the DRC's motion, Plaintiff's president, Ali Sulaiman, asserts that the DRC "purposefully retained" his company "because it was a United States company with the appropriate expertise to broker an international transaction legitimately and expeditiously." (Plaintiff's Response, Ex. O, Sulaiman Decl. at ¶ 6.) Even assuming, however, that Mr. Sulaiman has personal knowledge as to why the DRC selected

Against this backdrop, the Court finds that one of the decisions cited by the DRC,
*Tubular Inspectors, Inc. v. Petroleos Mexicanos,* 977 F.2d 180 (5th Cir. 1992), is
particularly instructive here. In that case, Mexico's national oil company, defendant
Petroleos Mexicanos ("Pemex"), agreed to purchase 19 valves from the plaintiff
corporation's Mexican subsidiary, Tubular Mexico. Pemex paid for 15 of these valves,
and claimed that it paid the remaining balance by presenting a check to two men who
identified themselves as Tubular Mexico employees. The plaintiff corporation, Tubular
USA, asserted that these men were not authorized to accept payment on its behalf, and it
brought suit in a federal district court to collect the unpaid balance of Pemex's debt. The
district court determined that it could exercise subject matter jurisdiction under the first
clause of § 1605(a)(2), but the Fifth Circuit reversed, finding that Pemex had

---

his company, he does not make the further claim that the DRC's choice of a U.S.-based
contracting partner was informed by its preference or understanding that this company would
perform a substantial portion of its contractual duties in the United States. Rather, Mr. Sulaiman
states only that the DRC "knew" — based, presumably, on its allegedly purposeful retention of a
U.S. company — that Plaintiff "would have to perform its obligations . . . from the United
States." (*Id.*) Again, even assuming this is so — a dubious assumption, given that Plaintiff also
had an office in the DRC, and presumably was capable of "consult[ing] catalogs" and
"communicat[ing] by fax and by telephone" from this DRC-based office as it attempted to
procure the military supplies sought by the DRC, (*see id.* at ¶ 7) — the Supreme Court has
expressly "reject[ed] the suggestion that § 1605(a)(2) contains any unexpressed requirement of .
. . 'foreseeability.'" *Republic of Argentina v. Weltover, Inc.,* 504 U.S. 607, 618, 112 S. Ct. 2160,
2168 (1992). Accordingly, even if the DRC deliberately selected a U.S.-based company to
procure military supplies on its behalf, and even if it was aware, in light of this selection, that
this company was likely to carry out at least some of its contractual duties in the United States,
this by itself would not establish that the DRC carried on commercial activity having "substantial
contact" with the United States. Otherwise, any foreign state that chose a U.S.-based partner for
its commercial activity would be subject to suit under the FSIA, based solely on the
foreseeability that this American company would likely perform some of its contractual
obligations in the United States.

"purposefully structured" the parties' transaction to "anchor it in Mexico," and that "Pemex's contacts with Tubular USA in Texas were sufficiently isolated to deny subject matter jurisdiction." *Tubular Inspectors,* 977 F.2d at 185-86.

In so ruling, the court acknowledged that the "case presents a close[] FSIA jurisdictional issue." 977 F.2d at 185 (footnote omitted). In particular, Pemex's transaction had a number of connections with the United States, including (i) the valves, which were of U.S. origin and were obtained by Tubular USA in the United States, (ii) the purchase orders issued by Pemex, which were addressed to "Tubular Mexico 'and/or' Tubular USA," and (iii) a visit by Pemex officials to Houston, Texas to inspect the valves and accept them for delivery to Mexico. 977 F.2d at 183-84. Nonetheless, the court found that the record evidenced Pemex's consistent "attempt to craft a Mexican transaction," where (i) Pemex's purchase orders were written in Spanish and addressed to Tubular Mexico's office, (ii) Pemex took no action in response to invoices issued by Tubular USA, but instead began making its payments — in pesos, and in checks "directed to Tubular Mexico through its Mexican banks" — in response to invoices issued by Tubular Mexico several months later, and (iii) Pemex representatives had traveled to Texas only at the insistence of Tubular USA, as a precondition to the shipment of the valves to Mexico. 977 F.2d at 184-85. Under this record, the court reasoned that dismissal was appropriate to "prevent[] Tubular USA from jurisdictionally having its cake and eating it, by doing business through a Mexican subsidiary as Mexican law requires but seeking to avoid the consequences of that choice when it comes time to sue for the purchase price of the

16

valves." 977 F.2d at 186 (footnote omitted).

 *Tubular Inspectors* arguably could be viewed as demarcating the outer limit of decisions in which a foreign state's contacts with the United States are deemed insufficiently "substantial" to satisfy the first clause of § 1605(a)(2), and this Court cannot say whether it would have decided that case the same way. The transaction at issue here, however, entailed far more limited contacts with the United States. The goods purchased by the DRC were not manufactured in or shipped from the United States, nor did the parties' agreement call for the DRC to make payment in the United States or in U.S. currency. Moreover, no DRC officials traveled to the United States (or even left their own country) in connection with the parties' transaction, whether to negotiate the parties' agreement, inspect the goods that Plaintiff proposed to provide, or address the repayment of the DRC's outstanding indebtedness. Under this record, the only connection between the DRC's commercial activity and the United States was the DRC's decision to retain a U.S.-based company to find and procure supplies for its military. Even then, however, the DRC (i) selected a company with an office in the DRC, (ii) agreed to make payment to a local bank in the country's own currency, and (iii) sent correspondence addressed to Plaintiff's office in Kinshasa and written in the DRC's official language, French. (*See* Complaint, Exs. B, E.) As in *Tubular Inspectors,* then, the DRC "attempt[ed] to craft a [DRC-based] transaction," *Tubular Inspectors,* 977 F.2d at 185, never reaching beyond its borders in its dealings with Plaintiff. Under this record, the mere fact that the DRC contracted with a U.S.-based company that carried out some of its duties from its

17

Michigan office does not give rise to "commercial activity carried on by [the DRC] and having substantial contact with the United States."  28 U.S.C. § 1603(e).

Further support for this conclusion is found in the statutory requirement that to overcome the sovereign immunity enjoyed by the defendant foreign state, a plaintiff's suit must be "based upon" the defendant's commercial activity carried on in the United States. 28 U.S.C. § 1605(a)(2).  As the Supreme Court has explained, this statutory language is satisfied only if the foreign state's commercial activity in the United States forms the basis for one or more of "those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case."  *Nelson,* 507 U.S. at 357, 113 S. Ct. at 1477.  The "based upon" language of § 1605(a)(2) "calls for something more than a mere connection with, or relation to, commercial activity."  *Nelson,* 507 U.S. at 358, 113 S. Ct. at 1478. Rather, to exercise jurisdiction under the FSIA's "commercial activity" exception, "there must be a significant nexus between the commercial activity in this country upon which the exception is based and a plaintiff's cause of action."  *Reiss v. Société Centrale du Groupe des Assurances Nationales,* 235 F.3d 738, 747 (2d Cir. 2000) (internal quotation marks, alteration, and citation omitted); *see also Tubular Inspectors,* 977 F.2d at 185 (noting that although officials from defendant Pemex had traveled to the United States, there was "no direct nexus between Pemex's meetings in this country and the [plaintiff's] breach of contract or conversion claims"); *de Sanchez,* 770 F.2d at 1391 (construing § 1605(a)(2) as requiring a court to "isolate those specific acts of the named defendant that form the basis of the plaintiff's suit"); *Callejo v. Bancomer, S.A.,* 764 F.2d 1101, 1110 n.8

(5th Cir. 1985) (explaining that the defendant's "commercial activities in the United States must have a nexus with the act complained of in this lawsuit").

In this case, there is only a tenuous connection between the fairly limited commercial activity carried out in the United States — solely by Plaintiff, and not the DRC — and Plaintiff's breach-of-contract claim.  First, it is immaterial to the DRC's alleged breach of its contractual obligation that Plaintiff conducted some of its activities in the United States.  Whether Plaintiff consulted catalogs and communicated with potential suppliers from its Michigan office, its office in the DRC, or elsewhere, the DRC's contractual obligation, and its alleged breach of this obligation, would remain precisely the same.  *See Kensington International Ltd. v. Itoua,* 505 F.3d 147, 156 (2d Cir. 2007) (finding that the "requisite nexus does not exist between [the defendant foreign state's] commercial activity in the United States . . . and the gravamen of [the plaintiff's] complaint," where the defendant's "acts in the United States had no bearing on [the plaintiff's] ability or inability to recover the money owed by" the defendant); *Gerding v. Republic of France,* 943 F.2d 521, 527 (4th Cir. 1991) (holding that the FSIA's "commercial activity" exception did not apply where the defendant foreign state's limited contacts with the United States had "no material connection with the [plaintiffs'] cause of action").

Moreover, because the parties' contract called for the DRC to issue payment to an account at the Bank of Zaire, the breach of this obligation occurred in the DRC, and this was the principal locus of the harm felt by Plaintiff as a result of the DRC's failure to pay.

19

*See United World Trade, Inc. v. Mangyshlakneft Oil Production Ass'n,* 33 F.3d 1232, 1239 (10th Cir. 1994) ("The fact that [the plaintiff], had it received additional funds in London pursuant to the contract, would have then transferred those funds to the United States does not allow us to conclude that the loss suffered by [the plaintiff] was sufficiently 'in the United States' to warrant jurisdiction under § 1605(a)(2)."). In addition, out of the over $14 million in damages sought by Plaintiff, surely only a small fraction of this amount could possibly be attributable to Plaintiff's fairly modest activities in the United States, while the bulk of this requested award is likely based on the underlying cost of the military supplies identified through Plaintiff's efforts — supplies which were manufactured in and shipped from South Korea, and not the United States. Finally, while Plaintiff recognizes that a breach-of-contract suit arising from the DRC's initial failure to pay its debt back in 1994 would surely be barred by the statute of limitations, it alleges that this otherwise time-barred claim has been revived by virtue of the DRC's repeated acknowledgment of its debt over the years. *See* Mich. Comp. Laws § 600.5866 (providing for the revival of an otherwise time-barred breach-of-contract claim through "the acknowledgment or promise of the party to be charged"). These acknowledgments, as well as the negotiations leading up to them, occurred in the DRC.

In a final effort to support its appeal to the first clause § 1605(a)(2) as a basis for overcoming the DRC's sovereign immunity, Plaintiff points to another passage in the above-quoted legislative history indicating that the "commercial activity" exception applies where the foreign state "receives financing from a private or public lending

20

institution located in the United States."  H.R. Rep. No. 94-1487, at 17, *reprinted in* 1976

U.S.C.C.A.N. at 6615-16.  Because the parties' contract evidently called for the DRC to

pay for the requested supplies at or after the time of delivery,[10] Plaintiff states that it was

required to "finance the transaction on behalf of" the DRC in order to procure the desired

supplies from the South Korean manufacturer, with a "substantial portion of these funds . .

. raised from sources in the United States."  (Plaintiff's Response Br. at 9.)  It follows, in

Plaintiff's view, that the FSIA's "commercial activity" exception applies in light of the

"financing" received by the DRC from a U.S.-based business.

      The Court does not believe that the parties' transaction can fairly be characterized

as entailing "financing from a . . . lending institution located in the United States."  First,

nothing in the record suggests that Plaintiff qualifies as a "lending institution," or that it

generally (or even occasionally) engages in lending.  Next, and more importantly, there

was no "financing" component to the parties' transaction, at least as that term is commonly

understood.  The parties' agreement did not include any provisions for payment in

installments, the accrual of interest, or any other terms that one would typically expect to

see in a financing arrangement.  Rather, so far as the record reveals, the DRC was

expected to make a single lump-sum payment upon receipt of the requested military

---

[10]To be accurate, the documents accompanying Plaintiff's complaint are not altogether clear as to when the DRC was to make its payment, but there is no indication that the parties contemplated payment in advance of delivery.

supplies.[11]  The fact that the DRC failed to make this payment, or that Plaintiff necessarily had to raise the funds needed to purchase the desired supplies from their South Korean manufacturer in anticipation of prompt reimbursement by the DRC, does not convert the parties' agreement into a "financing" transaction within the meaning of the FSIA's legislative history.  Certainly, Plaintiff has not identified any case law support for invoking this theory of jurisdiction under the facts presented here, and neither has the Court's own research uncovered any.  Accordingly, the Court finds that the allegations of Plaintiff's complaint fail to establish a basis for applying the "commercial activity" exception to the sovereign immunity otherwise conferred upon the DRC under the FSIA.[12]

## IV.  CONCLUSION

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendant's April 11, 2011 motion to dismiss (docket # 19) is GRANTED as to Defendant's appeal to sovereign immunity, and is otherwise DENIED AS MOOT.

s/Gerald E. Rosen_____
Chief Judge, United States District Court

Dated:  February 10, 2012

---

[11]To be sure, in the most recent memorandum of understanding negotiated by the parties in 2009, the DRC agreed to pay its debt in 14 equal monthly installments of just over $1 million each.  (*See* Complaint, Ex. J.)  Even then, however, the DRC was not called upon to pay any interest or penalties, as might be expected if a party had defaulted on a financing transaction.

[12]In light of this conclusion, the Court need not address the other arguments advanced in the DRC's motion to dismiss.

22

I hereby certify that a copy of the foregoing document was served upon counsel of record on February 10, 2012, by electronic and/or ordinary mail.

s/Ruth A. Gunther
Case Manager